United States District Court
Southern District of Texas

**ENTERED**

April 16, 2025

Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARIA I. DE LA GARZA, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:24-CV-00066 |
| | § | |
| BCW TRUCKING LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Defendants BCW Trucking LLC ("BCW") and Brad Lee Wilson ("Wilson")

(collectively, "Defendants") have filed a motion for summary judgment (Doc. No. 19).[1]  For the

reasons discussed below, the undersigned recommends that the district court GRANT

Defendants' motion for summary judgment in part and DENY it in part.

**A.  *Jurisdiction.***

The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

**B.  *Proceedings.***

Plaintiffs filed suit in the 105th Judicial District Court in Kenedy County, Texas in

February 2024, alleging that Wilson negligently operated a tractor-trailer.  (Doc. No. 1-4, p. 11.)

Plaintiffs also alleged that BCW was liable for Wilson's negligence under a theory of *respondeat*

*superior*, and that BCW was grossly negligent in hiring, supervising, retaining, and training

Wilson.  *Id.* at 12.  The underlying facts are discussed in greater detail below.  BCW and Wilson

removed the suit to this Court on March 12, 2024.  (Doc. No. 1.)

---

[1]  This case has been referred to the undersigned for pretrial case management and recommendations on dispositive matters.  *See* Doc. No. 9; 28 U.S.C. § 636.

Plaintiff's suit also named Arctichill Services, Incorporated ("Arctichill") as a defendant. (Doc. No. 1-4, p. 10.)  Plaintiff did not serve Arctichill with process, however, and the district court dismissed Arctichill as a defendant.  *See* Minute Entry, Initial Pretrial Conference, June 6, 2024.  The case then proceeded in this Court with the two remaining defendants: BCW and Wilson.  The Court later granted Defendants' motion to name Arctichill as a responsible third party.  (Doc. Nos. 10, 16, 18.)

Defendants have now filed a motion for summary judgment.  Plaintiffs have responded, and Defendants have replied.  (Doc. Nos. 19, 21, 22.)[2]

### C. Claims.

This case arises from a March 2022 vehicle incident in Kenedy County, Texas.  In their state court petition, Plaintiffs claim that they were traveling southbound on U.S. Highway 77 in Kenedy County.  They were injured, they say, "when their vehicle was struck by a cooler and debris from the tractor trailer operated by" Wilson.  (Doc. No. 1-4, p. 9 ¶ 9.)  Plaintiffs allege that Wilson was employed by BCW at the time, and that he was acting within the course and scope of his employment that day.  *Id.*[3]  They claim that Wilson and Arctichill "failed to properly secure the cargo load causing injuries and damages …."  *Id.*  In their petition, Plaintiffs included a sketch and description of the incident, prepared by a Texas state trooper.  The narrative states:

> Unit 1 [the tractor] was traveling Southbound on US 77 near Mile Marker 712 with Unit 2 [the trailer] in tow.  Unit 2 was hauling 8 coolers (cargo).  Unit 2's load was not secure.  A panel came [off] of the load and struck the front end of Unit 3 [Plaintiffs' vehicle] who was also traveling Southbound US 77 behind Unit

---

[2]  The Court struck a surreply that Plaintiffs filed without leave.  (Doc. Nos. 24, 25.)

[3]  BCW was Wilson's company.  He was the sole owner.  (Doc. No. 21-1, p. 54.)

1.  Unit 1, 2, and 3 all came to rest on the improved shoulder of southbound US
77.

(Doc. No. 1-4, p. 10.)

Plaintiffs have sued Wilson, claiming he acted negligently in the following ways, and that

such negligence proximately caused their injuries:

- Failing to conduct a proper pre-trip inspection;

- *Res ipsa loquitur*;

- Failing to maintain his vehicle in a manner that would allow safe operation;[4]

- Failing to blow his horn warning of imminent danger; and

- Failing to properly secure his load.

*See* Doc. No. 1-4, p. 11 ¶ 11.

Plaintiffs have sued BCW, alleging that BCW employed Wilson and is liable for

Wilson's negligence under the theory of *respondeat superior* because Wilson was allegedly

acting in the course and scope of his employment.  (Doc. No. 1-4, pp. 11-12 ¶¶ 13-16.)  Plaintiffs

also allege that BCW was grossly negligent "because of their hiring, supervision, retention, and

training" of Wilson.  *Id.* at 12.  They also claim that BCW is liable for gross negligence under a

*res ipsa loquitur* theory.  *Id.*[5]

---

[4]  Plaintiffs abandoned this theory of recovery at a status conference held on April 9, 2025.  The district court should therefore GRANT summary judgment on this claim.

[5]  Plaintiffs alleged that Arctichill, through its employees, was negligent in its failure to properly secure Wilson's cargo load.  (Doc. No. 1-4, p. 10 ¶ 10.)  Arctichill was also grossly negligent, Plaintiffs claimed, in its hiring, supervision, retention, and training of its employees and under a theory of *res ipsa loquitur*.  *Id.*  Arctichill was later dismissed as a defendant.  *See* Minute Entry, Initial Pretrial Conference, June 6, 2024.

### D. *The summary judgment motion.*

Defendants urge the district court to grant summary judgment on their ordinary negligence claim against Wilson.  They argue that the evidence demonstrates that Wilson did conduct proper inspections of the load.  (Doc. No. 19, pp. 5-7.)  They also argue that Plaintiffs cannot rely a theory of *res ipsa loquitur* because a responsible third party has been designated (*id.* at 7), that the evidence indicates that Wilson maintained his truck properly (*id.* at 7-8), that Wilson exercised reasonable care even though he did not blow his horn during the incident (*id.* at 8), and that the evidence indicates that Wilson properly secured the load (*id.* at 8-12).  Because Wilson did not act negligently, Defendants say, BCW cannot be held liable under a *respondeat superior* theory, and neither Wilson nor BCW can be found to have been grossly negligent.  *Id.* at 12.

Plaintiffs counter that the evidence shows that Wilson could have conducted a proper inspection of the load before leaving his origin point, but that he wrongfully failed to do so. (Doc. No. 21, pp. 11-18.)  Once he noticed that the panel was falling off his truck, Plaintiffs say, Wilson failed to exercise due care and continued driving for another quarter-mile before finally pulling over (too late to prevent the accident).  *Id.* at 3-6.  And Plaintiffs argue that because Wilson had exclusive control over the load, the doctrine of *res ipsa loquitur* applies.  *Id.* at 6-11.

In reply, Defendants argue that Wilson did what he reasonably could have done to inspect the load, given the condition in which Arctichill packaged and tendered it to him.  (Doc. No. 22, pp. 4-7, 7-9.)  They also contend that Wilson's driving actions when the panel began to fall off the load were reasonable, because he took immediate emergency action.  *Id.* at 2-4.

### E. The summary judgment evidence.[6]

Defendants have submitted the following evidence in support of their motion for summary judgment:

- An affidavit from Garry Wilmoski, proffered as an expert, opining that Wilson performed reasonable inspections of the load at the point of origin and throughout the trip and that the load was properly secured (Doc. No. 19-1);

- Wilson's deposition (without exhibits) (Doc. No. 19-2);

- An affidavit from Tom Hartman, proffered as an expert, opining that Wilson and BCW were in full compliance with all federal motor carrier safety regulations and that Wilson was "safely operating his commercial vehicle" (Doc. No. 19-3);

- Plaintiff Maria De La Garza's deposition (Doc. No. 19-4);

- Plaintiff Sergio De La Garza's deposition (Doc. No. 19-5);

- Plaintiffs' state court petition (Doc. No. 19-6);

- Wilson's vehicle inspection reports (Doc. No. 19-7); and

- The bill of lading for Wilson's trip (Doc. No. 19-8).

Plaintiffs have not objected to this summary judgment evidence.

Plaintiffs have submitted the following evidence in support of their opposition to summary judgment:

- Wilson's deposition (with exhibits) (Doc. No. 21-1).

Defendants have not objected to this summary judgment evidence.

---

[6] The facts discussed in this section are drawn from the competent summary judgment evidence. Only those facts relevant to the disposition of this motion are discussed. *See Gonzalez v. Herrman & Herrman, PLLC*, No. 2:22-cv-00282, 2024 WL 41191913, at *1 n.1 (S.D. Tex. Aug. 1, 2024) (Morales, J.) (citing *J.G. ex rel. Guajardo v. Bryan Indep. Sch. Dist.*, Civ. No. H-18-340, 2019 WL 3431274, at *3 (S.D. Tex. July 12, 2019) (Johnson, M.J.), *adopted*, 2019 WL 3430729 (S.D. Tex. July 30, 2019)).

In his deposition, Wilson stated that he became and remained a truck driver after retiring from the military in 1995 – he had also driven a truck for one or two years prior to his military career.  (Doc. No. 21-1, pp. 10, 11-13.)  Wilson owned his own trucking company (BCW) at the time of this incident, and operated the company for eight years.  *Id.* at 11.

Wilson owned the truck and trailer that he was driving when the incident occurred.  (Doc. No. 21-1, pp. 15, 16-17.)  He had arranged through a broker to transport the Arctichill load; he did not have any contract or agreement with Arctichill directly.  *Id.* at 27, 28.  When he picked up the load from Arctichill in South Carolina, Wilson performed his pre-trip inspection, which he said begins with a thorough look at the mechanical condition of the truck and trailer.  *Id.* at 28-29, 33.  Meanwhile, "while you're doing that, you're checking your load for securement, check – make sure if you're using chains and blinders that they're tight, if you're using straps, you make sure they're tight, make sure there's nothing hanging over the edge of your trailer, unless it's an old remissional [sic] load and they're supposed to."  *Id.* at 29.  Wilson would enter the results of his pre-trip inspections in his driver logs.  This entire process would take 15 to 30 minutes each time.  *Id.* at 29-30.

The Arctichill load was "some kind of cooler."  (Doc. No. 21-1, p. 34.)  Wilson described what he saw when he arrived at Arctichill's South Carolina facility to pick up the load: "[W]hen I got to the shipper, it was wrapped already in that plastic that it's got on it now in that photo, and it was in the crane.  It was in the air already waiting for me to back underneath it."  *Id.* at 35.  Arctichill lowered the cooler unit onto Wilson's trailer, "and it was bolted."  *Id.* at 41.  Wilson elaborated about how the load was secured to the trailer:

> The unit itself was bolted to a big steel frame, like a high beam frame, and that's what I secure, was the high beam frame to the trailer because the unit itself was bolted to it.  There's no way – and that's typical trucking, there's no way to secure

the unit safely.  You can't chain it like that, and you can't strap it, so they bolt them to frames for shipment.  And so I secured the frame front and back with two chains criss-crossing and two binders front and back.

*Id.*  Wilson took a photograph of the cooler on the trailer before leaving Arctichill's facility.  *Id.*

The entire setup looked like this:



*Id.* at 98.

The cooler appears to have been rather tightly wrapped, as shown in these two photographs, both of which were attached as exhibits to Wilson's deposition:





(Doc. No. 21-1, pp. 99, 100.)

Wilson stated that the cooler was "completely covered when I got there. The shrink wrap was already installed." (Doc. No. 21-1, p. 56.) Wilson testified that he could not see under the plastic

> because first of all, it's so tight and there's no flexibility to that, that type of plastic. It's not a tarp, it's actually a thick – probably – I don't know how many millimeters thick, but it's a thick heavy plastic, and they use that plastic to go around aircraft engines and boats and stuff like when they're in shipment. And on the bottom of this when it had about a six inch band around the bottom all the way around that held it tight against the bottom ….

*Id.* at 39-40. Wilson said later that he could not inspect the cooler "because it was shrink wrap[ped] when I picked it up and they wouldn't let me cut the shrink wrap off to inspect it." *Id.* at 20.[7]

Arctichill provided Wilson with a bill of lading for this trip. It stated that he was transporting an 11,000-pound item consisting of several smaller items that had been "assembled as one unit." (Doc. No. 19-8.) The bill of lading also contained this language, along with the signature of a person who was apparently an Arctichill representative:

> This is to certify that the above named materials are properly classified, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT.

*Id.*

Wilson departed Arctichill's South Carolina facility with the cooler and drove uneventfully through the southern United States. His destination was Brownsville, Texas. (Doc. No. 21-1, pp. 52, 53.) While Wilson was driving through South Texas in Kenedy County, a three-foot by three-foot metal panel "fell off the trailer." *Id.* at 8. Wilson explained:

---

[7] Wilson did not specifically state in his deposition (he was not asked) whether he asked Arctichill for permission to cut off the shrink wrap.

It came off of the left side, and if you look at the photographs, it shows the left side of the … trailer.  What I noticed was I pulled into the left lane to pass a slower vehicle, and I looked into my mirrors and when I glanced into my left mirror, I noticed a triangle hanging out below the plastic, below where the band was.  I knew immediately that wasn't right, and so I turned my turn signal on to get back over in the right lane so I could get off on the right shoulder because where I was at on the left lane there was no left shoulder there, and it took me a little bit to get back over.  Traffic kept coming around me, they wouldn't – instead of letting me move back over they was all speeding up and trying to get on by there, and where it came out was off of the left side.  But you know, what part of the cooler it came from, I don't know.

Id. at 36-37.  The panel was hanging out "below the edge of the banding on the plastic."  *Id.* at 37.  Wilson said that he saw the panel "come off.  I saw it hit the ground, and I watched about [three] cars run over it, and then it went straight up into the air."  *Id.* at 38.  Plaintiff Maria De La Garza testified at her deposition that the panel then hit the front of her car.  (Doc. No. 19-4, p. 48.)

Wilson testified that when he noticed the panel protruding from the left side, the panel was sticking out "maybe five or six inches.  It was down just enough for me to be able to notice it."  (Doc. No. 21-1, p. 38.)  Once Wilson realized the panel was sticking out, he put on his turn signal immediately.  He did not use his four-way hazard flashers, he said, because "if you put the hazard lights on, your turn signals don't work."  *Id.* at 37.  It took Wilson about a quarter of a mile to get over to the right shoulder and stop; this took less than a minute's time.  *Id.* at 38.

The panel ultimately landed in the grass left of the highway.  Wilson retrieved it:



*Id.* at 39, 107.

A trooper from Texas Department of Public Safety arrived on the scene.  Although the trooper did not immediately cite him, Wilson later received a citation for "fail to secure load / improperly secured load."  (Doc. No. 21-1, pp. 21, 103.)  Despite claiming that the ticket was later "absolved … like it never ever happened," Wilson also testified that he paid a $110 fine. *Id.*

Wilson had stated that he had been unable to look underneath the shrink wrap before beginning the trip, but after the incident, a picture was captured (presumably by the trooper) of Wilson looking under the shrink-wrap by the side of the road in Kenedy County:



*Id.* at 106.  He was also photographed using his cell phone to try to take a photo under the shrink

wrap:



*Id.* at 105.

The record contains no hard information regarding where the panel had come from.

Wilson testified in his deposition that he did not know where the panel had come from.  (Doc.

No. 21-1, p. 50.)  He testified that upon arrival in Brownsville

> we got ahold of the receiver, the buyer of it [the cooler], and asked them if we
> could cut that plastic off to see where that panel came from.  Hell, for all I know
> that panel didn't even go to that unit, it might have been something somebody lay
> up in there to just sit that off and fell out.  Somebody may have laid it up there
> and forgot about it.  I don't know.  There's nothing – there's nothing showing me
> anywhere where that panel came from.
>
> …
>
> And when I got down to Brownsville, we made a call through the receiver which
> was – I don't know if it was in Mexico, Venezuela, or wherever because that unit
> was going overseas and asked them if we could cut the plastic off and see where

> that panel came from and they said no, keep the plastic intact.  They did not want
> the plastic cut.  So we were kind of – our hands were tied.

*Id.* at 51-52.

Any further facts necessary to the disposition of the summary judgment motion are set forth in the discussion below.

**F.  Law.**

### 1.  *Legal standard for summary judgment.*

"The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses to help 'secure the just, speedy and inexpensive determination of every action.'"  *Ellis v. Klawonn*, No. 4:21-CV-00977, 2023 WL 3993043, at *2 (E.D. Tex. June 8, 2023) (quoting *Nat'l Cas. Co. v. Kiva Const. & Eng'g, Inc.*, 496 F. App'x 446, 449 (5th Cir. 2012)).  Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

In making this determination, courts must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file.  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  Courts must draw all justifiable inferences in favor of the party opposing the motion, and generally may not weigh the evidence or evaluate the credibility of witnesses.  *See id.*

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case,[8] then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248. Additionally summary judgment "may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

A summary judgment non-movant faces a significant burden if the moving party demonstrates an absence of evidence supporting the non-movant's case. "A scintilla of evidence does not suffice to create a genuine issue for trial." *Mota v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 2:23-cv-00116, 2025 WL 868723, at *2 (S.D. Tex. Mar. 20, 2025) (Morales,

---

[8] The defendants' motion could be read as a "no evidence" summary judgment motion. *E.g.*, Doc. No. 19, p. 2 ("To date, Plaintiffs have failed to produce any evidence that an issue of genuine fact exists ...."); *id.* at 5 ("Plaintiffs have provided no evidence to support these allegations of fact."). "Federal courts do not recognize the no-evidence motion for summary judgment; this type of motion may be filed in Texas state courts, but not in any federal court." *Bellamy v. Ford Motor Co.*, No. SA-22-CV00941, 2025 WL 35885, at *3 (W.D. Tex. Jan. 6, 2025) (citing cases). The moving party must inform the court of the basis for summary judgment and point to relevant excerpts from pleadings, discovery, admissions, or affidavits that demonstrate the absence of genuine factual disputes. *See id.* (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992)). Here, as discussed in the main text, the defendants do point to Wilson's deposition and other authorities to support their position, so the undersigned considers the defendants' motion as a "standard" motion for summary judgment asserting the absence of genuine factual disputes on essential elements and entitlement to summary judgment as a matter of law. *See Martinez v. Medical Depot, Inc.*, 434 F. Supp. 3d 537, 545 (S.D. Tex. 2020) (Alvarez, J.).

J.) (citing *Anderson*, 477 U.S. at 251). Although a scintilla is something less than the amount of evidence necessary to support a reasonable finding of fact, the non-movant must do more "than simply show that there is some metaphysical doubt as to the material facts." *Id.* at *5 (citing *Matsushita*, 475 U.S. at 586).

Because this case is before the Court based on diversity jurisdiction, the Court must apply Texas substantive law and federal procedural law. *Rosenberg v. Celotex Corp.*, 767 F.2d 197, 199 (5th Cir. 1985) (citing *Hanna v. Plumer,* 380 U.S. 460 (1965); *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938)).

### 2. Legal standard for recovery.

In Texas, negligence is proven when a plaintiff establishes the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach which result in damage. *See Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022); *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) (per curiam). "Whether a legal duty exists is a threshold question of law in a negligence action and is to be determined based on the facts surrounding the occurrence in question." *Dixon v. Leopoldo Garza Logistics, Inc.*, No. 5:17-CV-127, 2020 WL 4689217, at *2 (S.D. Tex. June 26, 2020) (Kazen, M.J.). Where a duty exists, the plaintiff bears the burden of showing that his or her injury was caused by the defendant in breach of that duty. *See Kroger*, 197 S.W.3d at 794.

Under the Texas Transportation Code, the duties and liabilities of a motor carrier and the remedies against the carrier are the same as prescribed by the common law unless otherwise provided by law. Tex. Transp. Code § 5.001(a)(1). Under Texas common law, a truck driver has a legal duty to safely secure his cargo. *See White v. Dietrich Metal Framing*, No. 1:06-CV-554, 2007 WL 7049797, at *7 (E.D. Tex. July 5, 2007); *accord Beglin v. Wal-Mart Stores, Inc.*,

16 / 29

No. SA-11-CA-724, 2013 WL 12384700, at *2 (W.D. Tex. Mar. 5, 2013) (citing *Fluor Eng'rs and Constr., Inc. v. S. Pac. Transp. Co.*, 753 F.2d 444, 453 (5th Cir. 1985) ("In general, a motor carrier bears the primary duty to ensure that its cargo is properly loaded and secure.")).  More generally, to establish a breach of duty a plaintiff must show "either that the defendant did something an ordinarily prudent person exercising ordinary care would not have done under the particular circumstances, or that the defendant failed to do something that an ordinarily prudent person would have done in the exercise of ordinary care."  *Stinson v. U.S. Postal Serv.*, No. 4:22-CV-01775, 2024 WL 3681730, at *2 (S.D. Tex. May 14, 2024) (Bryan, M.J.), *adopted*, 2024 WL 3681730 (S.D. Tex. Aug. 2, 2024) (citing *Douglas v. Aguilar*, 599 S.W.3d 105, 108 (Tex. App. – Houston [14th Dist.] 2020, no pet.)).

Additionally, "tort duty may in some cases be derived from statute or administrative rules rather than the common law."  *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 640 (Tex. 2023).  Section 392.9(a)(1) of Title 49, Code of Federal Regulations, requires that a driver "may not operate a commercial motor vehicle … unless … [t]he commercial motor vehicle's cargo is properly distributed and adequately secured …."  This provision has been held to establish a nondelegable duty on the part of a driver to secure the cargo he is transporting.  *E.g.*, *White*, 2007 WL 7049797, at *7.

In Texas, the "unexcused violation of a statute constitutes negligence as a matter of law if such statute was designed to prevent injury to the class of persons to which the injured party belongs."  *Moughon v. Wolf*, 576 S.W.2d 603, 604 (Tex. 1978); *see also Nelson v. H&E Equip. Servs., Inc.*, No. 14-21-00703-CV, 2023 WL 4503544, at *6 (Tex. App. – Houston [14th Dist.] July 13, 2023) (citing *Nixon v. Mr. Prop. Mgmt., Inc.*, 690 S.W.2d 546, 549 (Tex. 1985) and *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997)).  To constitute negligence *per se*, the

statutory violation must be a proximate cause of the injuries or damages claimed.  *See id.*

Negligence *per se* is established when "(1) the defendant's act or omission is in violation of a

statute or ordinance; (2) the injured person was within the class of persons which the ordinance

was designed to protect; and (3) the defendant's act or omission proximately caused the injury."

*Lopez-Juarez v. Kelly*, 348 S.W.3d 10, 27 (Tex. App. – Texarkana 2011) (citing *Ambrosia v.*

*Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 265 (Tex. App. – Houston [14th Dist.] 2000)).

      Proof of compliance with a statute or administrative rule, however, does not nullify a

common law duty (or disprove a breach of that duty) unless the statute or rule provides as much.

For example, in *Peterson v. Midstate Environmental Services, L.P.*, the plaintiff alleged that a

passing tanker truck splashed a "noxious chemical" onto her car, causing damage to the car and

injury to the plaintiff and her children.  The defendant moved for summary judgment, submitting

a "general compliance letter" from the Texas Commission on Environmental Quality stating that

the tanker truck had been transporting only used oil and oily water and that there was no

evidence of any spillage.  The court held that although the letter was "some evidence that

[defendants] were not negligent, the letter is not conclusive evidence."  No. 10-16-00162-CV,

2019 WL 91587, at *5 (Tex. App. – Waco Jan. 2, 2019); *cf. Morris v. JTM Materials, Inc.*, 78

S.W.3d 28, 50 (Tex. App. – Fort Worth 2002) ("Compliance with industry and statutory

standards is evidence of the use of reasonable care, but it is not dispositive of that issue.").

### G.  *Inspection and securement of load: summary judgment is inappropriate.*

      The essence of the defendants' summary judgment motion is that Plaintiffs have failed to

produce evidence of their negligence, as opposed to the negligence of Arctichill.  They argue that

Arctichill's act of shrink-wrapping the cooler so tightly that Wilson could not see inside to tell if

the cargo was secure prevented Wilson from doing a full pre-trip inspection of the load, and that

the inspection Wilson did conduct was sufficient and reasonable. The defendants also contend that their compliance with applicable motor carrier safety regulations (evidenced by their experts' opinions of compliance) further absolves them. Wilson's pre-trip inspection of the load was sufficient as a matter of law, they say, such that summary judgment is appropriate. *See* Doc. No. 19, pp. 5-7. Plaintiffs contend that a genuine issue of material fact exists on this point. (Doc. No. 21, pp. 11-18.) For the reasons discussed below, Plaintiffs have the better argument, and summary judgment is not appropriate.

At root, the question is not whether Wilson properly inspected the truck and trailer before the trip, *see* Doc. No. 19, p. 6, or whether he properly maintained the truck and trailer, *see id.* at 6-7, but instead whether Wilson performed a sufficient inspection of the load itself prior to or during the trip. Wilson contends that he inspected the load as best he could, but that the load was shrink-wrapped so tightly that he could not see inside, and thus that he could not have seen the panel that eventually fell from the trailer. Plaintiffs counter that such an inspection not only was possible, but that they have a photograph of Wilson actually performing one after the incident.

These are the relevant photographs, apparently captured on the body camera of the trooper who responded to the incident:

19 / 29





(Doc. No. 21-1, pp. 105-06.)  Although it is not clear what Wilson can or cannot see under the

shrink-wrap, or capture with his cell phone, it does not appear to have been impossible for

Wilson to have seen *anything*.  But the plaintiffs argue that Wilson did not make even this effort

prior to or during the trip.  Perhaps Wilson might not have been able to see the metal panel prior

to the trip by looking with his own eyes or with his cell phone in the limited way depicted in the

photographs,[9] but that is a fact question for a jury to decide, as is whether Wilson had an

---

[9]  Wilson testified that "you couldn't see underneath the plastic because first of all, it's so tight and there's no
flexibility to that, that type of plastic.  …  And on the bottom of this when it had about a six inch band around the
bottom all the way around that held it tight against the bottom …."  *Id.* at 39-40.  Wilson testified that he could not
get his arm far enough inside the shrink-wrap to take a cell phone picture, but he did not make this effort until after
the trip.  *Id.* at 40.  What was visible to Wilson's naked eye under the shrink-wrap is a fact question as well.  Wilson
did not testify that he could not see anything when he looked underneath the shrink-wrap himself as shown in the
photograph.  *Id.* at 106.  And the panel may or may not have been attached to or part of the cooler that Wilson was
transporting: as Wilson testified: "Hell, for all I know that panel didn't even go to that unit, it might have been
something somebody lay up in their to just sit that off and fall out.  Somebody may have laid it up there and forgot
about it.  I don't know."  *Id.* at 51-52.

obligation to attempt to do so.  The district court should conclude that, in the context of Wilson's common law duty to safely secure his cargo, a material fact question exists whether Wilson's inspection was sufficient.  *See* Tex. Transp. Code § 5.001(a)(1); *White*, 2007 WL 7049797, at *7; *Beglin*, 2013 WL 12384700, at *2.

The same result obtains in the context of the breach of any duty arising from the motor carrier safety regulations.  While agreeing that Wilson was bound by 49 C.F.R. § 392.9(a)(1)'s general duty to ensure that the load was properly distributed and adequately secured, the parties debate at length whether Wilson was required to inspect the cargo in the more detailed manner by 49 C.F.R. §§ 392.9(b)(1-3).  *See* Doc. No. 19, pp. 9-10; Doc. No. 21, pp. 18-21.  Those provisions require a driver like Wilson to:

> (1) Assure himself/herself that the provisions of paragraph (a) of this section have been complied with before he/she drives that commercial motor vehicle;

> (2) Inspect the cargo and the devices used to secure the cargo within the first 50 miles after beginning a trip and cause any adjustments to be made to the cargo or load securement devices as necessary, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from the commercial motor vehicle;

> (3) Reexamine the commercial motor vehicle's cargo and its load securement devices during the course of transportation and make any necessary adjustment to the cargo or load securement devices, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from, the commercial motor vehicle.  Reexamination and any necessary adjustments must be made whenever –

>> (i) The driver makes a change of his/her duty status;

>> (ii) The commercial motor vehicle has been driven for 3 hours; or

>> (iii) The commercial motor vehicle has been driven for 150 miles, whichever occurs first.

49 C.F.R. § 392.9(b)(1-3).  These provisions do not apply, however, to "the driver of a commercial motor vehicle that has been loaded in a manner that makes inspection of its cargo impracticable."  49 C.F.R. § 392.9(b)(4).  Wilson and BCW argue that, by encasing the cooler in such tight shrink-wrap, Arctichill packaged the cooler in such a way as to make inspection impracticable, and thus that Wilson was relieved of the duty to comply with § 392.9(b)(1-3)'s more stringent requirements.

For purposes of summary judgment, the same evidence that defeats the defendants' common law negligence argument also defeats their argument based on compliance with regulation: Plaintiffs counter that the photographs of Wilson actually looking under the shrink-wrap and attempting to take a cell phone photo debunk any claim of impracticability.  A jury may or may not ultimately agree with the plaintiffs about that, but whether the more thorough inspection procedures were impracticable in this particular case is a fact question for the jury to decide.  *Cf. Romero v. Irving Consumer Prods., Inc.*, 664 F. Supp. 3d 255, 265 (N.D.N.Y 2023) (fact question existed regarding whether trailer was loaded in a manner that made inspection of load "impracticable" under § 392.9(b)(4)); *Holmes v. Goodyear Tire & Rubber Co.*, No. 96 C 345, 1997 WL 106104, at *4 (N.D. Ill. Feb. 12, 1997) (fact question existed whether trailer was sealed and thus whether § 392.9(b)(4) excusal provision applied).

The defendants' citation to *Bujnoch v. National Oilwell Varco, L.P.* is unpersuasive.  In that case, a Texas appellate court found that the shipper of a load of oily mud had a duty to ensure that the mud was properly secured in the truck that was tasked with removing that mud from the shipper's job site: the truck leaked mud onto the roadway, resulting in a fatal crash.  542 S.W.3d 2, 9-12 (Tex. App. – Houston [14th Dist.] 2017).  Wilson and BCW cite the case in support of their position that only Arctichill should be held accountable for any failure to secure

the load.  (Doc. No. 19, p. 11.)  But while the *Bujnoch* court did find a duty on the part of the shipper (in this case, the shipper was Arctichill), it did not state or even discuss any avoidance of liability by the trucking company that hauled the load.  Thus, while the shipper may have also been subject to liability, *Bujnoch* did not relieve the trucking company from liability.  Wilson and BCW cannot rely on *Bujnoch* to escape liability here: *Bujnoch* might stand for the proposition that Arctichill can be held responsible in this case, but it does not mean that Wilson and BCW cannot.

The expert opinions supplied by the defendants do not compel a different result on summary judgment.  Those opinions, offered by Mr. Wilmoski and Mr. Hartman,[10] are exactly that – opinions – and do not supply conclusive proof that Wilson's inspections before and during the trip were sufficient or that more thorough inspection was impracticable.  "Even uncontradicted expert opinion testimony is not conclusive, and the jury has every right not to accept it."  *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1470 (11th Cir. 1989) (citing *Remington Arms Co., Inc. v. Wilkins*, 387 F.2d 48, 54 (5th Cir. 1967)).  A genuine of issue of material fact therefore exists whether Wilson's inspections of the load were sufficient.[11]

The district court should therefore DENY the defendants' bid for summary judgment with regard to Wilson's inspection and securement of the load.[12]

---

[10]  *See* Doc. Nos. 19-1, 19-3.

[11]  Relatedly, the district court should also reject the defendants' suggestion that Arctichill assumed responsibility for the packaging of the cooler by virtue of the language in the bill of lading that it provided to Wilson.  (Doc. No. 19, p. 11.)  The bill of lading stated:  "This is to certify that the above named materials are properly classified, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT."  (Doc. No. 19-8.)  That language, however, has been held not to apply to the loading or securing of cargo but "instead addresses transportation of hazardous materials and is a direct quote from 49 C.F.R. § 174.204(a)(1) dealing with such cargo."  *Patton v. Nissan N. Am., Inc.*, 143 F. Supp. 3d 468, 473 (S.D. Miss. 2015).

[12]  Should the district court find that summary judgment for the defendants on the question of impracticability of inspection is appropriate, the common law negligence claim should properly remain, because in this context

### H.  *Wilson's emergency maneuvers: summary judgment is appropriate.*

Wilson and BCW also seek summary judgment regarding Wilson's actions when the panel started to fall out of the trailer.  They argue that Wilson "did everything he could to exercise ordinary care in the operation of his motor vehicle" except blow his horn.  (Doc. No. 19, p. 8.)  Summary judgment for the defendants is appropriate.

"Texas law is clear that an accident alone does not constitute evidence of a breach." *Gould v. Wood*, No. 3:18-CV-786, 2019 WL 1930053, at *4 (N.D. Tex. Apr. 4, 2019) (citing *Trejo v. Laredo Nat'l Bank*, 185 S.W.3d 43, 48 (Tex. App. – San Antonio 2005)).  Nevertheless, Wilson was required to exercise ordinary care.  Here, the uncontradicted evidence indicates that he did so.

Wilson testified that, when he first noticed the panel beginning to emerge from the side of the trailer, he:

> knew immediately that wasn't right, and so I turned my turn signal on to get back over in the right lane so I could get off on the right shoulder because where I was at on the left lane there was no left shoulder there, and it took me a little bit to get back over.

(Doc. No. 21-1, pp. 36-37.)  Wilson had trouble making it to the right shoulder, though, because "[t]raffic kept coming around me, they wouldn't – instead of letting me move back over they was all speeding up and trying to get on by there …." *Id.* at 37.  Wilson was able to get to the right shoulder in less than a minute's time, having traveled about a quarter of a mile. *Id.* at 38-39. Wilson explained that he did not use his four-way hazard flashers during this time because he was trying to use his right turn signal, and that the turn signal would not work if the hazard

---

compliance with statute or regulation does not conclusively demonstrate an absence of common law negligence. *Cf. Peterson*, 2019 WL 91587, at *5; *cf. Morris*, 78 S.W.3d at 50.

flashers were activated. *Id.* at 37. Wilson does not appear to have sounded his horn during this time to warn other motorists of the protruding panel.

Plaintiffs characterize Wilson's actions as exhibiting disinterest to the danger, accusing him of choosing not to stop the truck sooner and faulting him for not activating his hazard flashers or honking his horn. (Doc. No. 21, p. 6.) But the evidence indicates that Wilson had good reasons for doing what he did: he immediately sought to pull his truck to the right side of the road (the only side that had a shoulder), and used his turn signal to indicate his intent to do so. Wilson reached the right shoulder and stopped after only a quarter of a mile, less than a minute after noticing the panel. Even if Wilson had sounded his horn, it is unclear whether people in vehicles behind him would have heard it. Although it is unfortunate that Wilson could not get to the side of the road before the panel fell off the trailer, Plaintiffs fail to demonstrate anything more than a scintilla of evidence (if they demonstrate even that much) that Wilson acted inappropriately once the panel began to fall out. *Cf. Mota*, 2025 WL 868723, at *2. The district court should GRANT the defendants' motion for summary judgment with regard to Wilson's emergency driving maneuvers.

### I. *Gross negligence and* **respondeat superior.**

The defendants seek summary judgment on Plaintiffs' gross negligence and *respondeat superior* claims, arguing briefly that because they are entitled to summary judgment on the ordinary negligence claims. (Doc. No. 19, p. 12.) Because the district court should grant summary judgment on the ordinary negligence claim relating to Wilson's emergency driving maneuvers, it should also grant summary judgment on the gross negligence and *respondeat superior* claims stemming from those same maneuvers. But because summary judgment is inappropriate with regard to the negligence claim relating to the inspection and securement of the

load, the district court should deny summary judgment on the related gross negligence and *respondeat superior* claims.

### J. Res ipsa loquitur.

Wilson and BCW seek summary judgment on the plaintiffs' claim that the doctrine of *res ipsa loquitur* applies in this case. (Doc. No. 19, p. 7.) They contend that because Arctichill has been designated as a responsible third party the doctrine cannot apply here.

*Res ipsa loquitur* is not a standalone cause of action separate from negligence: it is merely a rule of evidence. *See Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990). The doctrine applies when two factors are present. First, the character of the accident must be such that it would not ordinarily occur in the absence of negligence. Second, the instrumentality causing the injury must be shown to have been under the management and control of the defendant. *See id.* A plaintiff must show that the instrumentality was "wholly in the care of the defendant and not … meddled with by the person injured or third parties." *Trejo*, 185 S.W.3d at 48. A plaintiff need not completely eliminate the possibility of other causes for the accident aside from the defendant's negligence, but "'the likelihood of other causes must be so reduced that the jury can reasonably find that the negligence, if any, was committed by the defendant.'" *Spencer v. United States*, Civ. No. C-10-262, 2011 WL 3273052, at *7 (S.D. Tex. July 29, 2011) (Jack, J.) (quoting *Marathon Oil Co. v. Sterner*, 632 S.W.2d 571, 574 (Tex. 1982)).

In this case, Plaintiffs contend that the incident could not have occurred without Wilson's negligence. They argue that Wilson is the only person who had control over the load or how it was secured to his trailer, and that only Wilson had any access to or control over the load after Wilson left Arctichill's South Carolina facility. (Doc. No. 21, p. 8.) But Plaintiffs' *res ipsa loquitur* argument is a difficult one because another reasonable theory exists apart from Wilson's

negligence: the possible negligence of Arctichill in its packaging of the cooler. Although summary judgment for Wilson is inappropriate because a material fact question exists regarding Wilson's ability to inspect the load, it could also be reasonable that Arctichill, like the defendant in *National Oilwell Varco*, acted negligently in its packaging of the cooler for transport.

Because Plaintiff may not be able prove the "control" element, the doctrine of *res ipsa loquitur* may not apply in this case. The undersigned makes no recommendation for summary judgment on the question, however, because there is no claim for which to grant it. *Res ipsa loquitur* may not apply, but Plaintiffs' negligence claim continues against Wilson and BCW with regard to securement of the load. The district court may wish to take into account, if this case proceeds to trial, whether as an evidentiary matter the plaintiffs' invocation of the doctrine is inappropriate.

### K. Conclusion and recommendation.

The district court should take the following actions:

- DENY Defendants' motion for summary judgment (Doc. No. 19) with regard to Plaintiffs' claim that Wilson failed to properly inspect or secure the load;

- DENY Defendants' motion for summary judgment with regard to Plaintiffs' claims of gross negligence and *respondeat superior* regarding Wilson's alleged failure to properly inspect or secure the load;

- GRANT summary judgment for Defendants with regard to Plaintiffs' claim that Wilson failed to exercise ordinary care in his emergency driving maneuvers when the panel began to fall from the trailer;

- GRANT summary judgment for Defendants with regard to Plaintiffs' claims of gross negligence and *respondeat superior* regarding Wilson's emergency driving maneuvers when the panel began to fall from the trailer; and

- GRANT summary judgment for Defendants with regard to Plaintiffs' abandoned claim that Wilson failed to properly maintain his truck and trailer.

### L. *Notice.*

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within 14 days after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), and General Order No. 2002-13, United States District Court for the Southern District of Texas.

A failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

SIGNED on April 16, 2025.

MITCHEL NEUROCK
United States Magistrate Judge